[Cite as *In re G.W.*, 2013-Ohio-3402.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

**IN THE MATTER OF:**

    **G.W., III,**

**CASE NO. 1-12-49**

**ADJUDICATED DEPENDENT CHILD.**

**[YANICA WRIGHT – APPELLANT].**

**O P I N I O N**

Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2011 JG 28531

**Judgment Affirmed**

**Date of Decision: August 5, 2013**

**APPEARANCES:**

    *F. Stephen Chamberlain* **for Appellant/Mother**

    *Mariah M. Cunningham* **for Appellee, Allen Co. CSB**

    *James A. Roeder*, **Guardian Ad Litem**

Case No. 1-12-49

**WILLAMOWSKI, J.**

{¶1} Mother-appellant Yanica Wright ("Wright") brings this appeal from the judgments of the Court of Common Pleas of Allen County, Juvenile Division terminating her parental rights. For the reasons set forth below, the judgment is affirmed.

{¶2} This court initially notes that this case is a companion case to case nos. 1-12-48, 1-12-50, and 1-12-51. On July 15, 2003, G.W., III was born to Wright and an unidentified father. In December of 2006, G.W.'s brother, K.C., was adjudicated an abused child in case no. 2006-JG-23597 and G.W. was found to be a dependent child. Wright served a jail term for her abuse of K.C. The children were then placed under protective supervision, which terminated by operation of law on November 25, 2008.

{¶3} On April 29, 2010, G.W. was placed under the protective supervision of Allen County Children Services ("the Agency"), along with his three siblings, K.C., T.W., and M.W. He was removed from the home under an emergency shelter care order on December 17, 2010. Temporary custody of G.W. was granted to the Agency at that time. On March 21, 2011, a new emergency shelter care order was signed and temporary custody of G.W. was continued with the Agency.[1] The trial court granted the shelter care request due to Wright's failure to

---

[1] The new order was done because the prior case was being terminated by the two year deadline set forth by statute.

address G.W.'s medical and dental needs, the personal hygiene needs of her children and for denying the Agency access to her home. On March 22, 2011, the Agency filed a complaint alleging that G.W. was a dependent and neglected child.[2] The Agency alleged in the complaint that Wright had failed to comply with her mental health service plan, and that Wright failed to maintain a clean and safe environment for G.W. A case plan was filed on March 24, 2011. The case plan required Wright to complete the following goals: 1) obtain a psychological assessment, 2) attend counseling consistently, 3) take random drug screens and test negative for all illicit drugs, 4) maintain the home in a clean and safe condition, 5) permit the Agency personnel to check on the home conditions at random, unannounced times, and 6) communicate with her caseworker. On March 25, 2011, the Guardian Ad Litem ("the GAL") filed a motion to suspend Wright's visitation with the children. This motion was based upon the fact that Wright became irrational and aggressive during a visitation to the point that the police had to be called to escort her from the building. The motion was granted by the trial court on April 1, 2011.

{¶4} An adjudicatory hearing on the March 22, 2011, complaint was held on May 12, 2011. The magistrate determined that the previous action had begun due to the poor home conditions including finding human feces in the heat

---

[2] Service was attempted on the unknown father via publication. No one ever contacted the court to claim paternity.

registers. Wright had mental health needs that needed to be addressed. Wright did not follow the case plan and obtain the necessary counseling for herself. Although Wright had been found in contempt of court for her failure to follow the case plan, she still chose not to comply and had to spend 30 days in jail for contempt of court. In addition, Wright's March 2011 drug screen was positive for marijuana. Wright had been terminated from mental health services for noncompliance. Due to Wright's failure to allow the Agency to view the home and other failure to comply with the case plan, the magistrate determined that G.W.'s environment was unsafe and found him to be a dependent child. The dispositional hearing was held on May 20, 2011. Temporary custody of G.W. was granted to the Agency. The trial court adopted the decisions of the magistrate concerning adjudication and disposition on July 5, 2011.

{¶5} Wright, on August 18, 2011, filed a motion for in-home visitation with G.W. and his siblings. The Agency opposed the motion on the grounds that Wright was not complying with the case plan. A hearing on the motion for visitation and approval of a modified case plan was held on October 13, 2011. The magistrate noted that Wright had a positive drug test in August of 2011, but a negative one in September of 2011. The magistrate also noted that G.W.'s behavior had improved, but that they were trying a different medication to help his behavior more. Based upon Wright's unwillingness to follow the case plan and

address the issues, the magistrate denied her motion for in-home visitations. The magistrate also approved the modified case plan. The trial court adopted the magistrate's decision on November 9, 2011.

{¶6} On October 6, 2011, the Agency filed a motion requesting that Wright be held in contempt for not following the case plan by 1) failing to work with the family aid, 2) failing to allow the Agency access to all rooms in her home for inspection, 3) failing to have a source of income, 4) failing to take random drug screens when requested and failing the one she did take, and 5) failing to follow the recommendations of her psychologist or attend counseling. A show cause hearing was scheduled for February 29, 2012, regarding Wright's failure to comply with the court ordered case plan. At the hearing, Wright admitted violating the case plan by refusing a drug test and by testing positive. The magistrate decided that Wright was in contempt of court. The trial court adopted the magistrate's decision on April 16, 2012.

{¶7} On December 9, 2011, the GAL filed a motion to suspend visitation. The motion was based upon G.W.'s negative reactions prior to and following his visit with Wright on Tuesdays. The GAL indicated in his affidavit that G.W.'s worst days for behavior were Monday, Tuesday, and Wednesday. He indicated that G.W. would bang his head on the kitchen table and when asked why, would respond simply "mom." The night before, he would only sleep two hours at a

time, would get out of bed and destroy things. G.W.'s behavior at school on Monday, Tuesday, and Wednesday was significantly worse. In addition, on the way home after the visits G.W. would curse constantly and would wet the bed. Overall, G.W. was angry and agitated about visiting with Wright. The trial court granted a temporary order suspending visitation *ex parte* on December 14, 2011, with a full hearing scheduled for February 29, 2012.

{¶8} At the hearing, G.W,'s foster mother, Ashley Mertz ("Mertz") testified that since the visits were suspended, G.W.'s behavior had greatly improved. She testified that G.W. was sleeping through the night, was no longer hoarding food, and had calmed down at school. Feb. 29, 2012, Tr. 5. She testified that G.W. no longer was hitting and that while the visits were occurring, she received two or three calls a week from the school. Tr. 5. Since the visits terminated, G.W.'s behavior has been really good and she does not get calls from the school. Tr. 8. When she was taking G.W. home from the visits, he repeatedly kicked her seat, threw things and used "the 'F' word." Tr. 6. The magistrate's decision recommended suspending the visitation with G.W. The trial court adopted the magistrate's decision on April 16, 2012.

{¶9} On February 13, 2012, the Agency filed a Motion for Permanent Custody of G.W. The motion alleged that Wright had failed to comply with the case plan to substantially remedy the conditions of the home and has repeatedly

withheld medical treatment and food from G.W. The parties stipulated to the report of Dr. Thomas L. Hustak ("Hustak"), a forensic psychologist, regarding the psychological evaluation of Wright. The evaluation was completed in April of 2011. It was filed with the court on June 26, 2012. Hustak's report indicated that Wright claimed that it was K.C.'s behavior that caused the Agency to become involved with her family. She claims that the landlord called the Agency because K.C. would hit his siblings, urinated on the carpets, left bowel movements in the vents of the house, and refused to brush his teeth. Report, 4. Wright minimized her responsibility for the Agency's involvement by claiming that her caseworkers "had an attitude against me." Report, 5. Wright's idea for discipline involved physically striking G.W. *Id*. The mental status examination indicated that Wright has some difficulties with concentration. Report, 6. Her composite IQ was determined to be 72, which was below average. Report, 7. Her verbal score of 68 was "quite low, placing her in the 'lower extreme' category suggesting that 98% of the population scores higher than [Wright] and she has the verbal age of a 10 year old." *Id*. Hustak noted the following regarding Wright's adaptive behavior.

> **The results of this assessment showed that [Wright's] independent functioning in most areas was adequate. Exceptions included strong underarm odor and wearing clothes that were not properly cleaned. She apparently is appropriately mobile and has a telephone but she has no independent means of transportation. Other areas of independent functioning are adequate.**

> **[Wright's] physical development apparently shows no major difficulties. Her economic activity shows that she apparently does not use banking facilities but purchases her own clothing. Her speech sometimes exhibits halting and irregular interruptions but otherwise is reasonably developed. Social language development is lacking. She doesn't talk sensibly when interacting with CSB workers and they find it difficult to reason with her. Her self-direction is also lacking in that she needs encouragement to complete tasks, has little ambition, and her movement when observed by [the Agency] workers seems to be sluggish and slow. She becomes easily discouraged, needs encouragement to complete things that are assigned to her, and unfortunately does not always maintain self-control over her behavior. She doesn't respond to others in a socially acceptable manner and demonstrates significant impairment in the area of social behaviors. Specifically, when interacting with CSB she has used threatening gestures, has thrown objects, exaggerates stories of interaction with CSB workers, appears to manipulate others to get them in trouble, and has difficulties following instructions.**
>
> **When she does not get her way, she becomes upset, does not pay attention to instructions, hesitates for long periods before doing the tasks, and frequently does the opposite of what is requested. She resents those in authority, is disruptive, and tends to repeat things when asked questions.**

Report 8-9.

{¶10} Hustak administered the Minnesota Multiphasic Personality Inventory – 2 ("MMPI-2") to Wright. The results of the MMPI-2 indicated that Wright has problems with anyone who has power over her. Report, 10. Her response to relationships is to become aloof and cold in an attempt to advance herself at the expense of others. Report, 11. This profile on the MMPI-2 is indicative of one with a severe personality disorder. *Id.* Wright's disorder has

led to paranoid thinking. *Id.* People with profiles like Wright are likely to have angry outbursts that will be blamed on others. *Id.* Wright also is suspicious of other's motives and believes that she would be fine if people were not plotting against her. Report, 12. Wright's profile also indicated a borderline score on the schizophrenia scale. *Id.* Hustak determined that the prognosis for Wright is poor because from her perspective, "everything is caused by someone else other than the things that she herself does or fails to do." *Id.* Although there was no indication of psychotic or antisocial behavior, Wright's unusual thinking does interfere with her social interactions. Report, 13.

{¶11} Due to the indications of personality disorder issues, Hustak administered the Millon Clinical Multiaxial Inventory – III ("MCMI-III") to assess Wright's functioning. Report, 14. The MCMI-III indicated that Wright has traits of a compulsive personality disorder. *Id.* This is exhibited through perfectionism in her decision making and completion of tasks. However, due to her limited intellectual functioning, she is not capable of achieving perfectionism in her choices. Report, 15. "[I]n some ways, one could conclude that she is not very good at embracing her desire to be compulsive." *Id.* Wright views the world as rigid and becomes upset by her own indecisiveness. *Id.* To repress her thoughts of inadequacy, Wright creates positive thoughts of herself even if they are contradicted by the evidence. *Id.* The positive aspects of the MCMI-III were that

there was nothing to suggest that Wright suffered from anxiety, alcohol dependence, post-traumatic stress, borderline thinking, schizophrenia, depression, or a delusional disorder. Report, 16.

{¶12} In his conclusion, Hustak determined that a likely diagnosis for Wright would be "Personality Disorder NOS which takes into account the fact that she possesses traits and symptoms of the three personality types noted above in various combinations to account for her problematic behavior." Report, 17.

> **Unfortunately, this personality combination makes it very difficult to have [Wright] address problems when she is convinced that she does not have those problems and/or that the problems she sustains are caused by other people. When questioned about how these situations transpired with her children in regard to the concerns expressed by [the Agency], [Wright's] explanations were quite poor and offered little substance for understanding why things have gotten so out of control. \* \* \***
>
> **\* \* \***
>
> **While it is true that no scientific predictions can be made with any degree of absolute certainty about the future, one does need to evaluate risks for problems as they arise. At the time of her evaluation, [Wright] had significant limitations that would appear to place her children at risk. If she could follow all of the guidelines listed above, it would still be difficult to conclude that all of those risks would be eliminated unless clear evidence could be presented to professionals that a systematic and safe treatment plan with supervision, cleanliness, and safety could be adequately provided by [Wright] in her home environment. Frankly, the probability of this happening would be considered fairly low because her cognitive limitations are static (not changeable) whereas the personality configurations may be more**

> **dynamic (subject to change depending upon her willingness to do so).**

Report, 17, 20.

{¶13} The GAL filed his report on July 24, 2012. The GAL noted that he had reviewed the Agency's file on multiple occasions, reviewed the court records, reviewed Wright's Facebook page, reviewed Wright's psychological evaluation, spoken with the care providers and had multiple visits with G.W. GAL Report, 1-2. The GAL noted that G.W. has "flourished" in his foster placement, "especially after visitation with [Wright] was terminated." *Id*. at 2. The GAL indicated that he had spoken to G.W. and that the child indicated that he did not want to return to Wright. *Id*. Thus, the GAL recommended that Wright's parental rights be terminated and permanent custody be granted to the Agency. *Id.* at 4.

{¶14} On July 31, 2012, the parties stipulated to the admission of the testimony of Mertz from the February 29, 2012 hearing at the hearing for the motion for permanent custody. The hearing on the Motion for Permanent Custody was held from August 1-3, 2012. At the beginning of the hearing, the parties stipulated to the admission of Exhibit 2, the deposition of Erica Croft ("Croft") which was completed on June 28, 2012. Croft was K.C.'s kindergarten teacher. Croft testified that when they had meetings with Wright and her social worker, she was polite to her social worker, but hostile to the school faculty. *Id.* at 24. In addition to Croft's involvement with K.C., she had G.W. in her kindergarten class

for one day. *Id.* at 19. Due to Wright's antagonism towards Croft, Croft asked that G.W. be moved to a different class. *Id.* On the day he was in her class and on other days that she saw him at lunch or at recess, G.W. was unkempt. *Id.* at 20. G.W. had dirty hair and smelled of urine. *Id.* At the end of the first day, no one came to pick G.W. up from school and the school had to call Wright to come get him. *Id.* The problems with G.W.'s hygiene continued throughout his kindergarten year. *Id.* at 21.

{¶15} The first live witness was Judith Lester ("Lester"), who is a licensed social worker. Lester started working with K.C., G.W. and Wright in January of 2007. Tr. 14, 17. One of the reasons for her participation was to help Wright learn more positive parenting practices. Tr. 16. Lester testified that she discussed G.W.'s lack of cleanliness during home visits with Wright. Tr. 20. Wright denied that there was a problem and insisted that her children and their clothes were always clean despite all the evidence to the contrary. Tr. 20. Despite numerous meetings with Wright, she was frequently angry and out of control, so no real progress was made. Tr. 23. Lester only worked with Wright for two months because Wright was not cooperative. Tr. 25. Out of the ten home visits scheduled, Wright only was home and willing to work with Lester for five of the visits. Tr. 25. Lester provided Wright with instruction on how to use anger management techniques, but Wright just insisted they did not work. Tr. 28-29.

Rather than continuing to work on the anger issues, Wright just quit trying. Tr. 30. Lester noted that although she primarily was there to help Wright and K.C., she had reported that G.W. was delayed as well. Tr. 42.

{¶16} Lester also testified as to the condition of the home. On January 24, 2007, Lester visited the home and smelled the odor of something rotting throughout the home. Tr. 30. On February 8, 2007, there was a new puppy in the home and no one had cleaned up the dog feces from the living room floor. Tr. 31. Wright did then try to pick up some of the feces while Lester was at the home. Tr. 31. The smell was so strong that it was noticeable outside of the home. Tr. 42.

{¶17} Kelly Huffman ("Huffman") testified from her work with the family as a therapist. Huffman worked with Wright while doing family counseling for K.C. Tr. 47. Huffman tried to teach Wright how to model anger management techniques. Tr. 61. Wright did learn some skills and demonstrated that she could use them. Tr. 62. However, the higher Wright's frustration level, the less likely she was to use the techniques. Tr. 62. Her ability to use the anger management techniques was inconsistent over time and she eventually reverted back to her old methods of handling stress and frustration. Tr. 63.

{¶18} The next witness presented by the Agency was Kelly Smith ("Smith"), who was the family aide assigned to Wright by the Agency. Smith's job is to help the parents accomplish their case plan goals. Tr. 115. Smith worked

with Wright from December 2006 until June 2007. Tr. 117. Smith attempted to help Wright secure employment, learn parenting skills, and follow through with counseling. Tr. 119. Wright did complete the Parent Project Junior Class. Tr. 122. Although Wright would apply the parenting techniques she was taught in the short-term, she did not use them over the long-term. Tr. 126.

{¶19} Smith would meet with Wright sometimes in the home, but usually Wright was short tempered and uncooperative at those times. Tr. 126. G.W. would usually be in his bedroom and when Smith would ask why, Wright would tell her he was in trouble and it was none of Smith's business. Tr. 126. Wright did not think she needed assistance with her parenting. Tr. 127. Smith also testified that she was concerned about the interactions between Wright and G.W.

**Q.   How were the interactions between [Wright and G.W.]?**

**A.   It was a little different than things with [K.C.]. [G.W.] was very quiet, he was more shy than [K.C.]. There was a few instances that I saw firsthand of how she had treated [G.W.] that I had concerns for.**

**Q.   What were those?**

**A.   My first visit with [Wright], [G.W. and K.C.] were upstairs playing, I think playing in their bedroom; and [K.C.] had yelled that [G.W.] had pooped himself, and [Wright] immediately started screaming at him, and [G.W.] came down yelling. And at that time, [G.W.], you couldn't understand a whole lot that he he was saying. The only thing that I got out of it was, no, Momma, no, Momma, no whoop me, no whoop me, no whoop me; and he was spinning around in circles trying to get away from her, and she was yelling at him.**

-14-

**Q.    Approximately how old was [G.W.] at that time?**

**A.    Approximately three.**

**Q.    And how did Ms. Wright respond when he was begging her to not whoop him?**

**A.    The first time she said, I'm not going to whoop you; and she yanked him into the bathroom and cleaned him up; and he continued screaming, no whoop me. And while she was cleaning him up, it went on for at least five minutes with him screaming hysterical, no whoop me.**

**Q.    Did you discuss that you were concerned with Ms. Wright?**

**A.    Yes.**

**Q.  What did you tell her?**

**A.    I tried to calm them both down, and I told her that it's not appropriate to whoop a child for having accidents and that accidents are normal, especially for his age. And she said that she doesn't' whoop him anymore for that. * * ***

**Q.    And were there any other occasions where you were in the home and [G.W.] had an accident?**

**A.    It actually happened later during that visit and the same episode happened over again. And then I believe it was a month or two after I was completing another home visit and again the boys were upstairs, the same incident happened again; and she yanked him into the restroom then and told him to shut up when he was yelling, no whoop me, no whoop me.**

**Q.    When you said during that first home visit there was a second time and the same incident happened, did Ms. Wright handle it in the manner she had the first time with being upset with [G.W.]?**

**A.  Yes, she was still upset.  She handled it the exact same way that she did the first time.**

**Q.  Did you see her use any of the suggestions that you provided her with?**

**A.  No.**

Tr. 127-130.

{¶20} Smith testified that Wright had court ordered counseling sessions for K.C. and Wright.  Tr. 130.  Smith helped Wright to calendar her appointments.  Tr. 130.  In addition, Smith offered to provide transportation to and from the counseling appointments.  Tr. 130.  Wright still continued to be inconsistent in her attendance.  Tr. 130.  When questioned about counseling, Wright frequently lied about scheduling appointments, having rides, and even claiming to have attended sessions that she did not attend.  Tr. 131.

{¶21} Smith also attempted to help Wright seek employment.  Tr. 131.  Smith gave Wright tips on job searching, provided transportation to potential employment places, helped Wright complete applications and even provided a voucher for Wright to purchase clothes for an interview.  Tr. 132.  After a month, Wright declined the services claiming that she could get a job, but it was not her priority at that time.  Tr. 132.  The family was allegedly being supported by Wright's Met check of less than $100 a month and the money Wright made by selling candy bars.  Tr. 133.

{¶22} Smith testified that she frequently was in the home. Tr. 136. She was concerned about the conditions in the home. Tr. 136.

**The odor in the home was very overwhelming. It was a strong urine and feces smell. The carpet, you couldn't even tell like what, the carpet was so matted down with stains and different things on the carpet. There was a bad problem with cockroaches. There was a little bit of clutter, the few times that I saw the kitchen, dirty dishes, clutter, garbage overflowing.**

Tr. 136-37. When Smith addressed the issue of the home with Wright, she was told it was none of her business. Tr. 137. Eventually, Wright moved from the home on Hope Street to a different one on Catalpa. Tr. 139. When Wright first moved into the new home, it was nice. Tr. 141. The Agency provided Wright with new mattresses for G.W. to replace the soiled one. Tr. 141. They also provided her with a refrigerator, stove, table, pots, and pans. Tr. 141. G.W.'s bedroom was nicely set up with the new mattresses and bedding. Tr. 142. The house on Catalpa remained in good condition for less than a month. Tr. 141. Within that time, the cockroaches and the odor returned. Tr. 142. After that, Wright was uncooperative at the home visits and would not allow Smith to look at the other rooms, including the children's bedrooms. Tr. 142. Eventually, Wright would deny Smith access to the home and would not even let her see G.W. Tr. 143. This behavior continued despite Smith's reminder to Wright that she was there due to a court order. Tr. 143.

{¶23} Smith testified that Wright could be cooperative and open. Tr. 143. However, any time Smith tried to approach her about a concern, Wright would shut down because she did not want to hear about it. Tr. 144. The Agency attempted to help with the housing issue by providing cleaning supplies. Tr. 145. Smith personally volunteered to help her clean the home. Tr. 145. Smith made chore lists to help Wright learn what needed to be done and gave Wright tips on how to keep the house clean. Tr. 145. Wright was not receptive and declined the offer of help with the cleaning. Tr. 146. At times, the house would be cleaner, but the condition would not be maintained. Tr. 146.

{¶24} As to the personal hygiene of G.W., Wright was just as inconsistent. Tr. 147. G.W.'s clothing was frequently dirty and smelled of urine and feces. Tr. 147. To help with the situation, the Agency provided Wright with a washer and dryer so that she could clean G.W's clothing. Tr. 147. That did not help as Wright still did not wash his clothing. Tr. 148.

{¶25} Eventually, Smith's services as a family aide to Wright were terminated for noncompliance by Wright. Tr. 154. Smith testified that although she tried on numerous occasions to speak with Wright concerning the issues, Wright did not recognize there were problems. Tr. 154. Smith further testified that in her opinion, there was nothing more the Agency could have done to help Wright due to Wright's lack of compliance. Tr. 155.

{¶26} Christin Winter ("Winter") testified that she is a family aide for the Agency who had been working with Wright from May 2009 until July 2012. Tr. 168. At the beginning, Wright was living in a home on Woodward Avenue. Tr. 197. Winter was originally assigned to work with Wright on maintaining a safe and appropriate home. Tr. 168. Over time, her goals expanded to include helping Wright to find employment and teaching her about child developmental levels so that Wright's expectations would be reasonable. Tr. 170. At the beginning, Wright was cooperative with her, but she became less so as time passed. Tr. 170-71. Winter testified that if she gave Wright a task, such as cleaning out the refrigerator before the next visit, Wright would agree to do it, but never did. Tr. 171. Eventually, Winter had to bring another party with her on home visits for safety reasons. Tr. 171. When the caseworker would go with Winter, Wright was not receptive to anything the caseworker said. Tr. 174. Winter testified that Wright would tell the caseworker she was not allowed to speak, would ask her to leave, or would insist that the caseworker only speak to Winter and that Winter relay the information. Tr. 174. Wright would frequently ask Winter questions that only the caseworker could answer, but would refuse to speak to the caseworker when told that Wright would have to call her. Tr. 175. Wright even refused to give them a contact phone number. Tr. 177. The few times Winter would be given a number, Wright would tell her not to give it to the caseworker. Tr. 177.

{¶27} Winter was assigned to work with Wright on parenting techniques because of the Agency's concerns regarding appropriate discipline techniques. Tr. 178. Concerns were raised because on one occasion, Winter arrived at a visit to see a child in timeout and the children would remain there for the entire 45 minute visit. Tr. 178. When Winter mentioned to Wright that it was excessive, Wright responded that the child had been bad and would sit there until she told them they could get up. Tr. 179. Although Wright had taken several parenting classes, there has been no improvement in her parenting skills. Tr. 180. Wright could repeat what she was taught, but did not implement it in the home. Tr. 181. On most visits, Wright would either have G.W. in or would immediately send G.W. to his bedroom for the entire visit. Tr. 181. The result is that majority of the visits occurred without Winter ever seeing the children, even if the visits lasted for an hour and a half. Tr. 181-82. When questioned, Wright would say G.W. had been bad and that she had sent him to his room. Tr. 182.

{¶28} Winter had concerns regarding the conditions in the home. Tr. 182. There was spoiled, moldy food in the refrigerator, cockroaches throughout the home, and cords lying all around the floor presenting safety hazards. Tr. 182, 200. When Winter raised these issues with Wright, she would either roll her eyes and ignore Winter, or would say she would fix it, but never did. Tr. 183, 200. On several occasions, Winter found human feces in K.C. and G.W.'s bedroom. Tr.

197. In 2010, Wright started becoming less cooperative. Tr. 183. She eventually refused to let Winter or the caseworker into the house for an unannounced visit. Tr. 184, 200. If they went for an announced visit, they were asked to leave when they tried to address an issue that Wright did not want to discuss. Tr. 184. Eventually, Wright moved to a different home on Kenilworth. Tr. 201. Wright had refused to give them the new address, but Wright's mother gave it to the caseworker. Tr. 201. As before, the initial visits showed the new home to be in good order, but conditions deteriorated. Tr. 202. On the day G.W. was removed from the home, the conditions were deplorable. Tr. 205.

> **There were – there was food laying around, there were food wrappers, papers, there were several cockroaches that were crawling over my shoes and my supervisor's shoes while we were standing in there. There was an odor about the home, garbage, urine.**

Tr. 205.

{¶29} Winter continued to work with Wright after G.W. was removed from her custody. Tr. 184. Winter testified that G.W. had a difficult time at the beginning of visits and that Wright would lose her patience with him. Tr. 189.

> **There were times that [Wright] wanted the children to do a certain activity, such as sit down together and read or play a game; and [G.W.] was not at all interested, he wanted to do something else. Well, she would tell him that he would have to sit in the corner by himself if he wasn't going to read or if he wasn't going to play with the rest of them.**

> \* \* \*

-21-

> **I tried to explain to Ms. Wright that especially right after school time the children had sat all day in school and needed to run off some energy, that was just part of their age and it was just part of being a kid, and that she may want to think about going outside or maybe playing some more active games to get them, get some of their energy out before she tried to sit and read them a book.**
>
> **Q.   And when you offered those suggestions, did she start doing some of those things that you provided to her.**
>
> **A.   No.**
>
> **Q.   Did she continue to not let [G.W.] participate if he would not sit as she had requested?**
>
> **A.   Yes.**

Tr. 189-190.   Winter also testified that G.W. did not want to visit and was frequently verbalizing that he wanted to go back to his foster parents.   Tr. 193. Visits were stopped by court order after safety concerns for the staff due to Wright's behavior were raised.   Tr. 195.   Winter testified that she has seen some of the sibling visits.   Tr. 195.   Without Wright present, the children all interact more and the atmosphere was more positive.   Tr. 195-96.

{¶30} When questioned about her work with Wright, Winter testified that she usually only works with a family for up to a year rather than the three years she had worked with Wright.   Tr. 213.   Winter testified that for the majority of the three years, Wright had not been cooperative.   Tr. 213.

**A.** **[Wright] would not allow me to do unannounced visits, and that was part of the agreement that we had from the very beginning; she would not take the suggestions that I had given her; she wouldn't take things seriously when I would tell her that she needed to do something or needed to take care of something.**

**Q.** **Do you believe that prior to the children being removed from Ms. Wright's custody, there's anything further the agency could have done to maintain them in her home?**

**A.** **No.**

**Q.** **And why not?**

**A.** **She had been offered everything that we could possibly offer her: Transportation, help parenting, connecting with different resources in the community. There was nothing else that we could have offered her at that time.**

**Q.** **Did you, as a family aide, have concern about the children remaining in her care?**

**A.** **Yes.**

**Q.** **And why is that?**

**A.** **The ongoing concerns with home conditions, the way that she addressed the school when they would have concerns, her interaction with agency workers.**

Tr. 214. Counsel for the Agency also asked Winter if there was anything more the

Agency could do to assist in reunification.

**A.** **No, she was given all the same opportunities that she had before the children were removed. We tried some of the same services again.**

**Q.** **When you say you tried some of the same services again, what –**

-23-

**A. Counseling, offered her transportation wherever she needed to go for case plan services. I stayed on as the family aide, even though everything that I was going to address had already been addressed at some point.**

**Q. And did you again address those issues?**

**A. I did.**

**Q. Did you see an improvement?**

**A. No.**

Tr. 215-16.

{¶31} The next witness for the Agency was the GAL. He testified that he had been working with the family from 2006. Tr. 240. During his tenure, Wright had lived in multiple homes and they all eventually became deplorable. Tr. 242. For the first month or so after the family moved, the new home would be appropriate, but the conditions rapidly deteriorated and began to smell strongly of urine. Tr. 241-42. If the GAL came in the back door, the kitchen conditions were cluttered with the trash can overflowing, piles of dirty dishes in the sink, and empty liquor bottles laying around. Tr. 243. Throughout the Agency's involvement with the family, the conditions of the homes were an ongoing concern that was repeatedly addressed with Wright. Tr. 244. The homes were infested with cockroaches. Tr. 245. Wright was frequently uncooperative in allowing the GAL access to the home. Tr. 247. The last time Wright allowed the

GAL into her home was May 19, 2011. Tr. 248. Other visits were attempted, but Wright would not permit them. Tr. 249. When Wright would allow the GAL into the home, she would limit his access to certain rooms, specifically her bedroom which she kept padlocked shut. Tr. 253.

{¶32} The GAL was an active participant in the meetings with the school regarding K.C. Tr. 254. During the meetings, Wright was adversarial and would not admit that there was a problem. Tr. 254. This adversarial nature concerned the GAL and made him insist on her receiving a psychological evaluation. Tr. 259-60. Although Wright was cooperative in the beginning, she has become uncooperative with the GAL and the Agency over the last few years. Tr. 262-63.

{¶33} Tammy Nunnally ("Nunnally") was a case manager at Foundations Behavioral Health Services. Tr. 296. She was assigned to be G.W.'s case manager to assist him in adjusting to his foster home and to address his Reactive Attachment Disorder ("RAD"). Tr. 297. Nunnally first saw G.W. in September of 2011. Tr. 297. She testified that G.W. has inhibited RAD which is a "persistent difficulty to initiate or respond developmentally appropriately to most social interactions, and it is due to a persistent disregard for a child's physical needs at a very young age as well as a persistent disregard for a child's emotional needs, specifically needs of affection, comfort, that type of thing." Tr. 299. G.W. shows signs of hypervigilance, meaning that he is always on guard. Tr. 300. G.W. has

previously lived in "survival mode where he is protecting himself and wants to protect himself from the threat of rejection and disappointment." Tr. 301. G.W. had told Nunnally that Wright's primary discipline methods were to isolate him in a closet or withhold food. Tr. 319. Nunnally testified that G.W. avoids eye contact, is manipulative, and attempts to triangulate authority figures to maintain control. Tr. 302. She further testified that G.W. is far below his developmental age emotionally and academically. Tr. 303. To treat this issue, the foster parents are using attachment type parenting techniques with an emphasis on building empathy. Tr. 306. One of the symptoms G.W. has shown is the hoarding of food. Tr. 306.

{¶34} Nunnally testified that she has spoken with G.W. about the termination of his mother's visits. Tr. 309. She stated that G.W. was pleased that the visits were suspended and that he has expressed a desire to stay with his foster family forever. Tr. 309. She further testified that G.W. is developing an attachment to Mertz, which is a step forward in his treatment. Tr. 310. Nunnally finally testified that G.W. must have a secure placement because consistency is very important to a child with RAD so that they can start to form attachments. Tr. 324.

{¶35} Karen Martin ("Martin") was the caseworker supervisor for the Agency. Tr. 328. Martin testified that generally family aide services are usually

given to families for six to twelve months. Tr. 329. Martin was the one who agreed to give Wright extended services for three years. Tr. 329-30. The reason Martin gave for the extended services was that Wright was not cooperative and had failed to make progress. Tr. 330. According to Martin, the home conditions and the hygiene of the children remained poor and Wright failed to obtain employment, making it necessary for the family aide to continue her involvement. Tr. 330.

{¶36} Although Martin does not usually do home visits as part of her job, she did in this case to help facilitate communication with Wright on three separate occasions. Tr. 331. In November of 2010, Martin visited the home to discuss the contempt citation concerning the home conditions and the hygiene of G.W. Tr. 332-33. Martin testified that although the Agency was sending a cab to pick Wright up and take her to her counseling sessions, Wright still was not attending. Tr. 334. Martin also addressed the need for Wright to take G.W. to the dentist on a consistent basis. Tr. 336.

{¶37} Martin's second home visit was on December 17, 2010, which was the day they removed the children from the home. Tr. 337. On that day, the home conditions were of significant concern. Tr. 337.

> **The toilet in the bathroom was, appeared to be clogged and was overflowing with urine, feces, used toilet tissue. There were a large number of cockroaches present in the home. There was clutter, dirty dishes, dirty bottles, dirty silverware all in the**

**living room, a number of papers strewn about, overwhelming smell of urine. Carpet powder had been sprinkled in the boys' room to, I believe, try and alleviate some of the odor. There were no sheets on the bed. Large number of cockroaches, including some crawling on myself and other people that were in the room.**

Tr. 337-38. G.W. was not present at the home on that day because he was at school. Tr. 340.

{¶38} The third and final home visit by Martin occurred on June 4, 2012. Tr. 342. The home conditions were better. Tr. 342. Wright indicated that it was easier to keep the home better without the kids living there. Tr. 342. However, there were still dirty dishes in the kitchen, spilled food in the refrigerator, live roaches on the refrigerator, dead roaches in the dog's food dish. Tr. 342.

{¶39} As part of her job, Martin was involved with the case reviews. Tr. 344. Martin testified that Wright would come to the meetings, but was uncooperative. Tr. 345. At the meetings, Wright would not answer direct questions and would not make eye contact with any Agency personnel. Tr. 345. When reviewing the case, Wright would frequently shake her head and roll her eyes. Tr. 345. During the last year, Wright would insist that her attorney repeat the Agency questions before she would answer them. Tr. 345. Wright would sometimes cooperate, but on other occasions would state that she does not want to be told what to do because she knows how to parent her children. Tr. 347.

{¶40} Martin testified that the Agency had made numerous attempts to assist Wright. Tr. 348.

> **[The Agency] provided food vouchers, vouchers to buy cleaning products, transportation to appointments, we've assisted her with the purchase of appliances for the home, payment of utilities, rent, et cetera. Quite a bit of assistance, I believe.**

Tr. 348-49. Martin also testified that she agreed with the decision to remove G.W. from the home in December of 2010. Tr. 349. The decision was made because Wright was still in contempt of court concerning the home conditions. Tr. 349. The home conditions were still unacceptable, G.W. was still showing poor hygiene, and Wright had not worked with child support enforcement to determine the identity of his father. Tr. 349. Martin testified that the Agency had done everything it could to prevent the removal of G.W. from the home. Tr. 350.

> **In this particular case, I feel that the [Agency] had gone above and beyond standard level of reasonable efforts to attempt to maintain the children in the home with their mother.**

Tr. 350. Although the Agency took numerous steps and provided multiple services, they were unsuccessful. Tr. 351. After G.W. was removed from the home, Wright's level of compliance with the case plan did not improve. Tr. 352-53. Martin concluded after reviewing everything that in the three and a half years that the agency had been involved with Wright in this case, Wright has not substantially complied with the case plan and has not demonstrated the ability to safely parent G.W. in her home. Tr. 356.

{¶41} The next witness provided by the Agency was Michelle Miller ("Miller"), who was the caseworker for G.W.'s case since April of 2009. Tr. 382. That case was terminated by operation of law at the end of the two year period and the Agency immediately filed a new case to continue its involvement. Tr. 383. The children were removed from Wright's home on December 17, 2010, and have not been returned to Wright's custody since then. Tr. 384. Since she began her involvement in 2009, the case plans have been similar in goals. Tr. 392. Whenever Miller would attempt to address her concerns with Wright, Wright would respond that she would try, but she was doing her best. Tr. 399. Although Wright would make improvements at various times, she did not maintain the improvements. Tr. 399. On multiple occasions, Wright would not allow her access to the house or the children. Tr. 401-02.

{¶42} As for parenting skills, Miller testified that Wright had completed a parenting class. Tr. 406. Miller testified that Wright's parenting improved for a while, but it was not sustained. Tr. 407. Miller had concerns about how Wright disciplined G.W. Tr. 407. On one occasion, Wright made G.W. sit at attention for a minimum of 30 minutes, but Miller did not know how long G.W. had been forced to sit like that prior to or after her visit. Tr. 407-08. In Miller's opinion, the length of time was inappropriate for a time out. Tr. 408. When Miller

attempted to address the issue with Wright, Wright just would say that she did not parent in the same style as Miller. Tr. 408.

{¶43} Wright was also required to have a source of income to provide for the basic needs of the family. Tr. 421. Miller testified that Wright had not obtained employment, but received some income from "doing hair", babysitting, and selling candy and cakes. Tr. 422. Most of Wright's bills are paid by her mother. Tr. 422.

{¶44} The case plan also required Wright to attend counseling. Tr. 423. For a period of time, Wright was attending. Tr. 424. The counseling stopped when Wright lost her medical coverage. Tr. 424. Miller testified that Wright lost her coverage because she refused to cooperate with Child Support Enforcement by providing information about the possible fathers of the children, so they suspended her medical privileges. Tr. 424-25. Once Wright returned to counseling, she was limited to ten sessions. Tr. 426. However, Miller testified that the Agency notified Wright that if she completed the ten sessions, the Agency would pay for additional sessions that were needed. Tr. 426. Wright did not complete the required ten sessions. Tr. 426. Wright, at the time of the final hearing, was in counseling and was attending her sessions regularly. Tr. 439. Wright was working on her anger management. Tr. 440. However, she was not consistently applying what she had learned. Tr. 440.

{¶45} Miller testified that the relationship between Wright and herself became adversarial. At one point, Wright refused to allow Miller in the home unless Wright's attorney was present. Tr. 430. The meetings were unproductive because Wright would only speak to her attorney and would have no direct communication with Miller. Tr. 431. Wright became completely uncooperative and refused to discuss the case plan with Miller or anyone else. Tr. 432.

{¶46} Due to issues with drug usage, Wright was ordered to comply with drug screens. Tr. 433. Miller requested that Wright have 19 drug screens. Tr. 434. Wright only complied and took 16 drug screens. Tr. 434. Of those, three tests were positive for marijuana. Tr. 435. The case plan was then amended to require a drug and alcohol assessment, which Wright completed. Tr. 437. Wright then completed the Drug and Alcohol Awareness Class. Tr. 437. However, the third positive test was after Wright completed the class. Tr. 438.

{¶47} Once G.W. was removed from the home, Wright was granted one visitation a week for two hours each time. Tr. 448. Miller testified that Wright missed her visits while in jail for contempt of court for failing to comply with the court ordered case plan. Tr. 448. Upon her release, Wright did not contact the Agency to arrange for visits for two or three weeks. Tr. 448. Afterwards, Wright rarely missed a visit. Tr. 448.

{¶48} Miller testified as to the services offered by the Agency as follows.

> **The [Agency] has offered [Wright] more services than I have ever offered any other client. We have tried multiple things. We've tried Respite, she refused to do Respite, trying to give her a break. I've tried to work with her for support systems to set up to try to give her a break. I've tried multiple things, multiple service providers, switched service providers for her. You know, nothing worked.**

Tr. 450. When Miller questioned Wright about possible permanent placements for the children, Wright refused to discuss the issue with Miller. Tr. 451. G.W. had been placed in his foster home with two of his siblings for over a year. Tr. 453. In that time, G.W. had integrated into the home and has bonded with the family. Tr. 454. That home has been identified as a potential adoptive home for G.W. Tr. 454. G.W. has expressed a fear of being returned to Wright and has indicated to Miller that he did not wish to return to return to Wright's home. Tr. 455.

{¶49} In opposition to the case presented by the Agency, Wright presented the testimony of four witnesses, including herself. The first witness to testify was Barbara Walton ("Walton"), a community health worker who helped Wright after her pregnancy in 2010. Walton testified that she attempted to meet with Wright at least twice a month. Tr. 516. She testified that before coming to the home, she did not call and give advance notice. Tr. 516. Walton testified that during the visits, she did see some roaches, but did not see clutter. Tr. 519. She did not notice the smell of urine or feces in the home. Tr. 520. Wright was very cooperative with Walton and did not hesitate to show her the home. Tr. 521.

{¶50} Wright's second witness was Darlena Stewart ("Stewart"), a friend of the family. Stewart testified that Wright fed the children. Tr. 557. Stewart admitted that at times, she could smell urine in Wright's home, but denied ever smelling feces. Tr. 558. Stewart also admitted to seeing roaches in the home. Tr. 565. Stewart testified that Wright sought medical attention for the children when it was needed. Tr. 564. In addition, Stewart testified that she went with Wright to a couple of visits. Tr. 568. Wright acted appropriately with the children. Tr. 569. The discipline Stewart observed Wright use was mainly yelling at the children. Tr. 570.

{¶51} Sandy Wright ("Sandy") is Wright's mother and testified on Wright's behalf. Sandy testified that Wright always kept her home clean. Tr. 608. She also testified that she never saw any cockroaches or noticed any smell of urine in the home. Tr. 608-09. Sandy indicated that her daughter disciplines the children by putting them in time out for approximately five minutes. Tr. 620-21.

{¶52} Wright herself testified on her behalf. Wright testified that the family aide bought her cleaning supplies but did not actually do anything. Tr. 654. Wright claimed that she tried to follow the suggestions of the family aide. Tr. 654. The relationship between Wright and the Agency soured when Miller became her caseworker. Tr. 655. Wright felt like Miller wanted her to do everything Miller's way and would not let her make any parenting decisions for herself. Tr. 655.

Wright was concerned because she believed that some of Miller's instructions contradicted what she had been taught in parenting class. Tr. 656. Miller also was not helping her with dealing with K.C.'s behavioral issues at the school and at home, specifically his hitting people and stealing. Tr. 657-58.

{¶53} When questioned about the home, Wright testified that the family aide did give her suggestions for cleaning, which she took. Tr. 664. Wright claimed that most of the time, her house was clean. Tr. 664. She admitted that when Miller became her caseworker, she developed "an attitude" when Miller would try to instruct her on what to do. Tr. 666. Rather than getting too angry, Wright would instead ask Miller to leave. Tr. 666. Wright testified that when she met her current counselor, things improved and she learned how to control her temper. Tr. 667-68. Throughout her testimony, Wright indicated that all of the issues were the result of her poor relationship with the Agency personnel and that she had worked on that issue and could now work with them better. Tr. 767.

{¶54} At the conclusion of the hearing, the trial court was unable to conclude the case due to some transcripts which had been stipulated to by the parties that had yet to be filed.[3] As a result, the trial court delayed the closing arguments until a later date. Closing arguments were scheduled for October 11, 2012. However, on October 12, 2012, the parties all waived closing arguments

---

[3] The transcripts were subsequently filed and considered by the trial court in reaching its judgment.

and the case was submitted to the trial court. The trial court entered its judgment entry terminating Wright's parental rights to G.W. on October 19, 2012. Wright appeals from this judgment and raises the following assignments of error.

### First Assignment of Error

**The awarding of permanent custody by the trial court below was not based upon clear and convincing evidence and therefore improper.**

### Second Assignment of Error

**The reliance of the trial court upon corporal punishment of a child by a parent that took place prior to the filing of a complaint and was, in fact, the basis of a prior complaint for abuse that was terminated and the children returned to the mother is misplaced and violates the rights of a parent to reasonable physical discipline of a child.**

### Third Assignment of Error

**The State of Ohio through [the Agency] failed to make reasonable efforts to provide services to the family here and to avoid the permanent removal of the children from the home.**

{¶55} In the first assignment of error, Wright alleges that the findings of the trial court were not supported by clear and convincing evidence. The right to raise one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards

have been followed. Id. When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include in pertinent part as follows.

**(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**

**(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \* \***

**(2) With respect to a motion made pursuant to [R.C. 2151.413(D)(1)], the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

**(C) In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent**

**custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

**\* \* \***

**(D)(1)  In determining the best interest of a child at a hearing held pursuant to division (A) of this section \* \* \*, the court shall consider all relevant factors, including, but not limited to, the following:**

**(a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies \* \* \* for twelve or more months of a consecutive twenty-two-month period \* \* \*;**

**(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

**\* \* \***

**(E)  In determining at a hearing held pursuant to division (A) of this section \* \* \* whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant**

**evidence. If the court determines by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**

**(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**\* \* \***

**(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

R.C. 2151.414.

{¶56} At the time the Agency filed the motion for permanent custody, G.W. had not been in the temporary custody of the Agency for more than one year. Thus, the trial court was required to determine whether there were sufficient factors under R.C. 2151.414(E) to support the conclusion by clear and convincing evidence that G.W. could not and should not be placed with Wright within a

reasonable period of time. The trial court determined that Wright had not shown that she could keep the house clean for a sustained period of time. This occurred despite the fact that the agency had been working with her for many years and had made many attempts to help her. There was a great deal of testimony by multiple witnesses that although Wright would start out with a clean house, within a month, it would be back to substandard conditions with roaches, clutter, and an overwhelming stench of urine coming from it. While Wright had custody of G.W., he frequently went to school dirty and smelling of urine and feces. The Agency worked with Wright for several years before removing G.W. and continued to work with her afterward. Thus, there was clear and convincing evidence as to the first factor under R.C. 2151.414(E)(1).

{¶57} In addition, there was substantial evidence that Wright lacked commitment to provide an adequate home for G.W. Wright frequently would not work with the Agency workers to try and help G.W. When the workers would offer assistance, she would decline it. When the caseworkers wanted to view the home, she refused. Even when Wright allowed the workers into the home, she refused to give them access to all the rooms. At times, she even refused the workers access to the children. When it came to counseling, Wright would decide to discontinue her therapy if she believed the therapist was reporting to the Agency. Over the multiple years she worked on her case plan, she did not make

much progress and most of the progress she did make disappeared over time. Given this evidence, the trial court could conclude by clear and convincing evidence that Wright lacked the commitment to providing an adequate home as set forth in R.C. 2151.414(E)(4).

{¶58} Having found factors under R.C. 2151.414(E) present, the trial court was required to enter a finding that G.W. cannot be placed with Wright within a reasonable time. The trial court then had to consider the factors under R.C. 2151.414(D) to determine if the termination of parental rights was in the best interest of G.W. The trial court specifically stated that it had considered the factors. A review of the record shows that two of G.W.'s siblings were residing in the same foster home as G.W. and the foster parents were continuing to allow G.W. to have a relationship K.C., who was in a different foster home. The record indicates that G.W. had adjusted well to being a part of the foster family. R.C. 2151.414(D)(1)(a). G.W., through the GAL and through the testimony of the caseworker, indicated that he did not want to return to his mother. R.C. 2151.414(D)(1)(b). The trial court also considered the length of time G.W. was in the temporary custody of the Agency and his need for a permanent placement. R.C. 2151.414(D)(1)(c, d). In addition, the foster parents had expressed interest in adopting G.W., which would help to grant a permanency that G.W. needed and wanted. That was the outcome that G.W. wanted.

{¶59} Upon a review of the lengthy record, there was more than sufficient evidence to support the trial court's conclusions by clear and convincing evidence that G.W. could not be returned to Wright within a reasonable period of time. There was also more than sufficient evidence to support the trial court's conclusions by clear and convincing evidence that the termination of Wright's parental rights was in the best interest of G.W. Thus, the trial court did not err in terminating the parental rights of Wright and the first assignment of error is overruled.

{¶60} Wright claims in the second assignment of error that the trial court erred by relying upon the prior claim for excessive physical discipline. A review of the record shows that there is no basis for this assignment of error. Although the trial court mentioned the prior claim while discussing the history of the case, it was not one of the reasons cited by the trial court for the termination of parental rights. The trial court cited to the deplorable home conditions as well as the children's personal hygiene, Wright's resistance to working with the school, her resistance to counseling, her refusal to cooperate with the Agency workers, and her refusal to work with the GAL. Oct. 19, 2012, J.E., 5-7. The trial court also pointed to how G.W.'s behavioral issues and hygiene have improved since he has been out of the home. *Id.* at 8. The trial court pointed to the long history this family has with the Agency and how Wright has made little sustained progress

over the many years the Agency has worked with her. *Id*. at 7-8. Specifically, the trial court noted that the psychological evaluation showed that Wright had a low IQ and a poor prognosis for changing her behavior due to her paranoid thinking. *Id*. at 8-9. At no point did the trial court rely upon Wright's conviction for physically abusing K.C. during the earlier case. Thus, the trial court did not err. The second assignment of error is overruled.

{¶61} Finally, Wright argues that the trial court erred by finding that the Agency had made reasonable efforts to provide services to the family to avoid the removal of the children. The evidence does not support Wright's claim. The record indicates that the Agency did everything it could to assist Wright. The Agency allowed Wright to continue to try and reach the same goals set forth in the case plan since 2009. During that time, Wright was provided with a family aid to try and help her learn to be a better parent, to learn to clean the house, and to assist with finding employment. The family aid went above and beyond the expectations by volunteering to help Wright clean her house. The Agency helped Wright by providing cleaning supplies, furniture, and appliances so that Wright could provide an adequate home for G.W. The Agency also provided transportation so that Wright could attend counseling sessions. The problem was not with what the Agency offered, it was Wright's refusal to make use of what was offered. Based upon the testimony before it, the trial court could very

reasonably conclude by clear and convincing evidence that the Agency did everything it could to prevent the removal of G.W. from the home and to attempt to return G.W. to the home. The third assignment of error is overruled.

{¶62} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, the judgment of the Court of Common Pleas of Allen County, Juvenile Division is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**